**In re James H. MITCHELL, III and Mary A. Mitchell, Debtors.**

No. 00–15497–JNF.

United States Bankruptcy Court, D. Massachusetts.

Nov. 15, 2000.

James H. Mitchell, III, Mary A. Mitchell, debtors pro se.

Doreen Solomon, Boston, MA, for Chapter 13 Trustee.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

### I. INTRODUCTION

The matter before the Court is the Debtors' Verified Motion to Vacate Dismissal of this Court's order of September 19, 2000, dismissing their Chapter 13 case pursuant to 11 U.S.C. § 109(g).[1] The issue presented by the Motion to Vacate Dismissal is whether the Debtors' unsecured debt exceeds the ceiling set forth in 11 U.S.C. § 109(e), thereby disqualifying them for relief under Chapter 13, because of a judgment entered against them in the sum of $275,000. If the Debtors are ineligible for relief under Chapter 13 granting their Motion to Vacate would be futile.

---

**1.** Section 109(g) of the Bankruptcy Code provides in relevant part the following:

(g) Notwithstanding any other provision of this section, no individual or family farmer may be a debtor under this title who has been a debtor in a case pending under this title at any time in the preceding 180 days if—

(1) the case was dismissed by the court for willful failure of the debtor to abide by orders of the court, or to appear before the court in proper prosecution of the case. . . .

11 U.S.C. § 109(g).

In view of the Debtors' Verified Memorandum of Law Concerning Their Eligibility to Be Chapter 13 Debtors, which Memorandum is 130 pages long and contains references to 85 exhibits; the Affidavit of Marilyn W. Mitchell in Support of Debtors' Memorandum of Law Concerning Their Eligibility to Be Chapter 13 Debtors; the Opposition of Xytest Corporation to Debtors' Motion to Vacate Dismissal; the Affidavit of Richard E. Bennett; the Debtors' Verified Reply Memorandum in Support of Debtors' Verified Motion to Vacate Dismissal, which Reply Memorandum is 53 pages long and contains references to five exhibits; the Declaration of James H. Mitchell, Jr. in Support of Debtors' Verified Reply Memorandum in Support of Debtors' Verified Motion to Vacate Dismissal; the Response of Xytest Corporation to Debtors' Reply Memorandum in Support of Their Motion to Vacate Dismissal; the Debtors' Verified Sur–Surreply Memorandum in Support of Debtors' Verified Motion to Vacate Dismissal, which Sur–Surreply Memorandum is 34 pages long and contains references to three exhibits; and the Debtors' Supplement to Verified Sur–Surreply Memorandum in Support of Debtors' Verified Motion to Vacate Dismissal, the Court finds that oral argument with respect to the Debtors' Motion to Vacate Dismissal is unnecessary and unwarranted. For the reasons set forth below, the Court denies the Debtors' Verified Motion to Vacate Dismissal and modifies its order of September 19, 2000.

## II. FACTS

The following facts cannot be controverted. With the exception of the judgment entered by the California Superior Court for San Mateo County, which judgment is attached as Exhibit 1 to the Affidavit of Richard E. Bennett, the Court has gleaned the facts from the petition, Schedules, Statement of Financial Affairs, Statement Concerning Schedules, and pleadings filed by the Debtors in their Chapter 13 case and their pending Chapter 7 case (Case No. 94–18204–JNF).

The Debtors filed a voluntary petition under Chapter 13 of the Bankruptcy Code on August 15, 2000. On their petition, they disclosed their pending Chapter 7 case. The Court takes judicial notice that an adversary proceeding is pending in the Debtors' Chapter 7 case in which two creditors, Xytest Corporation ("Xytest") and George R. Berbeco ("Berbeco"), are seeking a determination that a judgment that they obtained in the Superior Court of San Mateo, California in June of 1999 in the sum of $275,000 is nondischargeable either as a post-petition debt or under 11 U.S.C. § 523.[2] The Debtors and Somerset Capi-

2. On June 15, 1999, the Honorable Thomas McGinn Smith of the Superior Court of the State of California in and for the County of San Mateo entered a form of judgment in Case No. 401860 captioned *Xytest Corporation, on behalf of itself and as successor to FET/Test, Inc. and Thermonics Incorporated, James C. Kufis, George Kurtz, George R. Berbeco and Paul J. Roberts v. Somerset Capital Corporation, James H. Mitchell, III, and Mary A. Mitchell.* The Judgment provided the following:

This matter having come before the Court, the evidence having been presented, the parties having been heard and the matter having been submitted to the Court,

IT IS HEREBY ADJUDGED, ORDERED, DECREED AND DECLARED by this Court that:

1. Having found for the plaintiffs that the fraud of defendants, both in the inducement and actual, so permeates each and every one of the transactions in issue in this action, the FET/Test Term Sheet (dated February 16, 1995), the FET/Test Confidentiality Letter (dated August 29, 1995), and Thermonics Confidentiality Letter (dated March 10, 1997) (the "Purported Agreements") are and each one is hereby declared to be void and to be unenforceable and to have no legal force or effect; and further, having so found for the plaintiffs, the defendants have no claim or cause of action against plaintiffs arising out of the Purported Agreements or the aforesaid transactions (Civil Code §§ 1572, 1573); and further, having so found for the plaintiffs, there would be no purpose in reforming or rescinding the Purported Agreements as said agreements are void and unenforceable; and further,

tal Corporation ("Somerset") appealed the California judgment.

The Debtors filed Schedules, a Statement of Financial Affairs and a "Statement Concerning Schedules" on August 15, 2000 with their petition. At the top of each Schedule, they wrote "This page is subject to the qualifications specified in the attached Statement Concerning Schedules."

On Schedule A—Real Property, they indicated that they do not own any real property. On Schedule B—Personal Property, they disclosed ownership interests in cash on hand ($100), audio equipment ($500), household goods and furnishings ($5,000), two automobiles ($1,000 and $3,500), and two dogs and two cats ($100). With respect to other categories of personal property, namely stock and interests in incorporated and unincorporated businesses, interests in partnerships or joint ventures, accounts receivable, other contingent and unliquidated claims of every nature, patents, copyrights, other intellectual property, and office equipment, furnishings and supplies, the Debtors stated "Please see attached Statement." On Schedule C—Property Claimed as Exempt, the Debtors claimed the bulk of their property as exempt. On Schedule D—Creditors Holding Secured Claims, the Debtors listed Loretta A. Troy, Mary Mitchell's mother, as the holder of a lien on the Debtors' 1993 Ford Taurus. The Debtors indicated that the amount of Loretta Troy's secured claim was $3,500 and that the unsecured portion of her claim was $2,400. The Debtors listed no creditors on Schedule E—Creditors Holding Unsecured Priority Claims.

On Schedule F—Creditors Holding Unsecured Nonpriority Claims, the Debtors listed 39 creditors. Of the 39 creditors, the Debtors listed six creditors as holding noncontingent claims as follows: 1) Catuogno Court Reporting Services ($400), 2) David Bromley ($46,330),[3] 3) Mihaly, Schulyer & Mitchell, a Los Angeles, California law firm at which the James H. Mitchell, III's father, James H. Mitchell, Jr., is a named partner (the Debtors indicated that the amount of the claim was unknown), 4) National Video Reporters (the Debtors indicated that they disputed the claim in the amount of $2,106.08),[4] 5) Quinlan Court Reporting ($2,103), and 6) William J. Pitak, Mary Mitchell's father, ($1,500). Thus, the Debtors listed two creditors, who are insiders, as that term is defined in 11 U.S.C. § 101(31)(A), with noncontingent claims, and only four non-insider creditors with noncontingent claims.

The Debtors listed Xytest as the holder of a contingent claim in the amount of "0.00." They indicated that the claim was incurred in January of 1995, that the claim was subject to setoff, and that there was no consideration for the claim. They also

---

2. Having found for the plaintiffs as described above, plaintiffs did not breach and have not breached any duty to the defendants with respect to the Xytest merger on August 26, 1997, or the transactions leading to said merger, defendants have no right or interest in ownership or management of Xytest, and said merger and the transactions leading to said merger are not invalid or voidable as a result of the Purported Agreements or the transactions in issue; and further,

3. Having found for the defendants with regard to a fifth cause of action, for defamation, said count is dismissed; and further,

4. Having found for the plaintiffs as described above, damages are awarded in the sum of $25,000, plus punitive damages based upon the fraud of the defendants in the sum of $250,000, plus costs incurred.

3. The Debtors indicated the following with respect to this claim: "Check payable to FET Acquisition Company, Inc. for $25,000 dated April 24, 1996. This is the amount owed with interest as of June, 2000." As will be discussed below, this statement and the Bromley's affidavit attached to the Debtors' Verified Sur–Surreply Memorandum indicates that Bromley is not a creditor of the Debtors, but rather a creditor of Somerset.

4. The Debtors further indicated that the claim was incurred in December of 1998 with respect to the videotaping of a deposition, adding that "[l]awsuit filed by them was dismissed."

referred to their attached Statement Concerning Schedules, further indicating that Xytest was a "precautionary creditor." The Debtors provided much the same information with respect to the claims of the remaining 32 "precautionary creditors," including Thermonics, Inc., Paul J. Roberts, James C. Kufis, George B. Kurtz and George R. Berbeco, FET/Test, Inc., as well as numerous attorneys and law firms that represented both the plaintiffs in the California action and the Debtors. On Schedule H—Codebtors, the Debtors listed Somerset as a codebtor with respect to 23 of the 39 claims appearing on Schedule F.

The Debtors filed Schedules I and J—Current Income and Expenses of Individual Debtor(s), but included no information on these Schedules other than their ages on Schedule I. At the top of Schedule I, they wrote: "Please see attached Statement." At the top of Schedule J, they wrote: "Please see other Schedule J." Thus, in lieu of Schedule J that is part of Official Bankruptcy Form 6, the Debtors filed their own "Schedule J" on which they simultaneously included both their personal and business expenses broken down for the calendar year 1999 and for the seven month period beginning on January 1, 2000 and ending on July 31, 2000. Accordingly, the Debtors did not provide an itemization of either their monthly individual income or expenses.

The following chart summarizes the Debtors' expenses for the January 1 to July 31, 2000 period and includes a monthly sum obtained by dividing the Debtors' figures for that period by seven.

| CATEGORY OF EXPENSE | 7 MONTH PERSONAL | 7 MONTH BUSINESS | 7 MONTH TOTAL | MONTHLY PERSONAL | MONTHLY BUSINESS |
|---|---|---|---|---|---|
| Alimony and maintenance | | | | | |
| Animal Expenses | $1,992 [sic] | | $1,991.78 | $284.54 | |
| Automobile (excluding car payments) | $265 | $1,061 | $1,327 | $37.86 | $151.57 |
| Clothing | $893 | | $893 | $127.57 | |
| Credit Card Payments [2] | $5,363 | | $5,363 | $766.14 | |
| Dependents—Support of | | | | | |
| Equipment rental and leases | | (8) [sic] | (8) [sic] | | |
| Food | $4,343 | | $4,343 | $620.43 | |
| Housing and Office Space Expenses | | | | | |
| Rent | $6,580 | $9,870 | $16,450 | $940 | $1,410 |
| Increase in property tax payment | $559 | $838 | $1,396 | $79.85 | $119 .71 |
| Repairs and upkeep | | | | | |
| Other [sic] | $688 | $1,032 | $1,720 | $98.28 | $147.43 |
| Installment Payments | | | | | |
| Insurance | | | | | |
| Renters | $148 | | $148 | $21.14 | |
| Life | $20 | | $20 | $2.86 | |
| Health | $1,134 | | $1,134 | $162 | |
| Auto | $301 | $1,203 | $1,503 | $43 | $171.86 |
| Miscellaneous | | | | | |
| Laundry and Dry Cleaning | $21 | | $21 | $3 | |
| Litigation Expenses | | $49 | $49 | | $7 |
| Medical and Dental Expenses | $2,764 | | $2,764 | $394.86 | |
| Office Supplies | | $358 | $358 | | $51.14 |
| Recreation, Clubs and Entertainment | $1,005 | | $1,005 | $143.57 | |
| Taxes | | | | | |
| Telephone | $834 | $3,336 | $4,169 | $119.14 | $476.57 |
| Temporary Help | | | | | |
| Transportation (not including car payments) | | | | | |
| Travel and Entertainment | $24 | $357 | $381 | $3.43 | $51 |
| Utilities | | | | | |

| Electricity and Heating Fuel | $495 | $743 | $1,238 | $70.71 | $106.14 |
|---|---|---|---|---|---|
| Toiletries/Household | $571 | | $571 | $81.57 | |
| Charity | $10 | | $10 | $1.43 | |
| Postage | $147.87 | $222 | $370 | $21.12 | $31.71 |
| Cash [sic] | $1,005 | $335 | $1,340 | $143.57 | $47.86 |
| Miscellaneous [3] | $813 | | $813 | $116.14 | |
| **TOTALS** | $29,973.75 | $19,394.95 | $49,368.70 | $4,282.21 | $2,771.99 |

2. Notably, no credit card debt was listed on Schedule F.

3. According to the Debtors, this category includes bank fees, credit card fees, service charges, credit reporting agency fees, and other miscellaneous expenses such as haircuts.

The chart shows that the Debtors' total monthly expenses are approximately $7,050. The Debtors disclosed that their total expenses for 1999 were $102,706.13 of which $44,324.69 was attributable to business expenses and $58,381.80 was attributable to personal expenses. When these figures are annualized, the Debtors' business expenses ($3,693.69) and personal expenses ($4,865.80) for 1999 significantly exceed the personal and business expenses computed by the Court based on the Debtors' expenses between January 1, 2000 and July 31, 2000. For the calendar year 1999, their average monthly expenses were approximately $8,560; for the first seven months of this year, their average monthly expenses totaled $7,050, a $1,510 difference.

The Debtors signed the "Declaration Concerning Debtor's Schedules" on August 15, 2000 pursuant to which they declared under penalty of perjury that their Summary and Schedules were true and correct. The Debtors, however, purported to qualify their Declaration. At the very top of the page, they typed in a caveat: "This page is subject to the qualifications specified in the attached Statement Concerning Schedules."

The Statement of Financial Affairs filed by the Debtors on August 15, 2000 is substantially incomplete. In response to the questions about, among other things, their 1) income from employment or operation of a business, 2) income other than from employment or operation of a business, 3) payments to creditors, suits, and administrative proceedings, executions, garnishments and attachments, 4) other transfers, 5) closed financial accounts, and 6) the nature, location and name of businesses they operated within two years of the date of the filing, the Debtors stated, "Please see attached Statement." Additionally, they qualified their Declaration as to the truthfulness of the Statement of Financial Affairs with a reference to the Statement Concerning Schedules.

The Debtors did not sign their 29–page Statement Concerning Schedules, which they filed with their petition. It contains eleven sections as follows: I: Introduction and Definitions; II: Income; III: Expenses; IV: Assets; V: Bank Accounts; VI: Claims against Third Parties; VII: Stock and Equity Ownership; Officers and Directors; VIII: Litigation; IX: Claims and Purported Claims by Third Parties against the Debtors; X: Executory Contracts; and XI: Miscellaneous. In section I, the Debtors stated that the following:

*To the extent appropriate, this statement modifies and supersedes the information contained in the Schedules. To the extent there is any discrepancy [sic] or conflict between this statement and the Schedules, the facts contained in this statement are correct, rather than the information contained in the Schedules.*

Also in section I, the Debtors stated that they have two business activities: 1) acting as the sponsor of leveraged buyouts and consolidations, or attempting to orchestrate such financial transactions; and 2) consulting in information systems, including systems installation, system design and

analysis, programming training, and other forms of consulting. In a footnote, the Debtors stated that Somerset is owned by the Debtor, James Mitchell and that Mary Mitchell has never been an owner of Somerset, "although she provides services to Somerset (for no current compensation) and it is run out of the home she shares with James Mitchell." The Debtors added the following:

> In addition, the Debtors have been involved in some litigation, some of which has generated income. Currently the Debtors are involved in a very complex business dispute with the Extended Xytest Group. Marilyn Mitchell has provided funds to the Debtors in part because she hopes to recover funds from such lawsuits, and also as a precaution against being frivolously sued by the Xytest Group.[5]

In section II of their Statement Concerning Schedules, the Debtors disclosed their sources of income. They stated the following:

> For purposes of the "regular income" definition of Chapter 13, the Debtors have listed as income all cash received in the relevant time periods, plus payments made by third parties for the [sic] benefit *to the extent* that the Debtors have been able to identify the amount of such payments. The Debtors have also included cash received by companies they control.

(Emphasis in original). The Debtors disclosed that the principal source of their income is "payments received from Mari-

lyn Mitchell totaling $70,800 per year, plus additional amounts for litigation expenses." They also disclosed that Mary Mitchell's father, William Pitak, sometimes gives them small amounts of money and sometimes loans them money. Additionally, they stated that Mary Mitchell's mother, Loretta Troy, has given them $685 this year for veterinary and other bills. They added that Marilyn Mitchell "has paid some expenses directly and has not provided the Debtors with copies of such bills and checks," and that she paid for a three week trip to California for the trial in the Xytest litigation. The Debtors added that they did not include as income "hotel and animal boarding because these bills were paid directly by Marilyn Mitchell."[6] The Debtors did not disclose, and thus the Court must find that the Debtors do not have, any income from their two business activities, i.e., acting as the sponsor of leveraged buyouts and consolidations and consulting in information systems.

In section V, the Debtors disclosed that they do not have any bank accounts,[7] that Marilyn Mitchell maintains a bank account into which she deposits funds so that the Debtors have access to every day cash and a debit card for the purchases of "food, postage, gas, heating oil, etc." They indicated that "Mary Mitchell is listed as a power of attorney and has check-signing authority" with respect to that bank account. According to the Debtors, Marilyn Mitchell also maintains a bank account from which she makes payments on their behalf. The Debtors also disclosed that Loretta Troy maintains a bank account

---

5. According to the Debtors, the Extended Xytest Group includes Xytest, FET/Test, Inc., Thermonics, Inc., Berbeco, Roberts, Kurtz and Kufis, and attorneys and law firms who represented these individual and entities.

6. Additionally, they stated "[f]or some expenses, such as car rental and meals, Marilyn Mitchell sent money to the Debtors, which they then used to pay these litigation expenses. These monies have been included. Thus, the litigation expenses of the Debtors is [sic] underrepresented."

7. On August 15, 2000, the day they filed their petition, the Debtors filed a "Notice Concerning Insurance, DIP Checking Account, and Trade Debt." In that document, they stated that "[t]he Debtors do not have a checking account in their name, but rather the Debtors' expenses are paid from a checking account owned by Marilyn Mitchell, a relative of the Debtors. The Debtors do not anticipate opening up a checking account in their name during the pendency of this bankruptcy case." They added that "[t]he Debtor's business incurs trade debt."

with respect to which Mary Mitchell has a power of attorney. The Debtors indicated that Loretta Troy permits the Debtors to use funds from the account on a case by case basis but that it is unclear whether these monies are gifts or loans.[8]

In section VI of their Statement, the Debtors discussed their claims against third parties. They indicated that they have claims against Michael A. Collora and Dwyer & Collora, LLP for breach of contract, legal malpractice and other torts. They further indicated that they have claims against numerous attorneys who took part in the Xytest litigation, stating that "[t]he Debtors believe that the value of such claims against these attorneys are in excess of $10 million, irrespective of any Chapter 93A claims and punitive damages". The Debtors qualified the amount of the claims by stating that they believe that the amount of damages might depend on the outcome of the litigation with the Extended Xytest Group.

The Debtors also stated that they may have claims against Stephen S. Gray and The Recovery Group, Inc., which they valued in excess of $100,000;[9] claims against Barbara D. Gillmore, the successor trustee in their Chapter 7 case, and the firm of Sullivan & Worcester, which they valued in excess of $1 million. They qualified these figures with the caveat that *"given the uncertainty of litigation, the Debtors make no representation or prediction as to the amount of monies that will be awarded at trial or collected via settlement."*

In section VII of their Statement, the Debtors stated that James Mitchell "asserts" that he owns all of the common stock of Somerset and that the issue of who owns Somerset has not been determined by this court in their Chapter 7 bankruptcy case. They added that they believe that Somerset owns a portion of the claims against the Extended Xytest Group.

In section VIII, the Debtors disclosed that they are Debtors in a pending Chapter 7 case and that they were involved in two prior Chapter 7 cases as the result of the filing of involuntary petitions against them. With respect to their pending Chapter 7 case, they disclosed, in their Verified Sur–Surreply Memorandum, that Marilyn Mitchell filed the involuntary Chapter 7 petition against them because she had loaned them "a considerable amount of money" and "she was frankly irked that the Debtors were spending a considerable amount of time on what she viewed as a ridiculous lawsuit, a landlord-tenant dispute that erupted into seven different actions." The Debtors did not disclose that James Mitchell has named his mother as a defendant in Count XV of the "Counterclaims and Third Party Complaint" filed in Adv.P. No. 99–1375 now pending in their Chapter 7 case. Pursuant to that Count, he is seeking a determination that he owns Somerset when in the Schedules and Statements of Financial Affairs filed in their Chapter 7 case, the Debtors did not claim that James Mitchell had an ownership interest in Somerset and, in fact, indicated that it was a corporation owned by another person.

In section VIII, the Debtors also disclosed that David Bromley filed an involuntary petition against Somerset in 1999 (Case No. 99–40955–JFQ).

In section IX of their Statement, "Claims and Purported Claims by Third Parties against the Debtors," the Debtors discussed their "Precautionary Creditors," as well as "Liquidated vs. Unliquidated" claims among other things. With respect to precautionary creditors the Debtors indicated that by that term they meant "individuals, companies and firms [that] have no valid claims against the Debtors as of the filing of this petition." With respect to liquidated versus unliquidated claims, they stated the following:

---

**8.** Loretta Troy is not listed as an unsecured creditor on Schedule F.

**9.** Stephen Gray was the first trustee appointed in the Debtors' Chapter 7 case.

It is the Debtors' position that almost all of the purported creditors listed in the Schedules do not have valid claims against the Debtors, and thus their claim is $0. Since their claim is $0, the Debtors have listed these claims as liquidated, since the amount can be easily ascertained (Namely $0). If this Court determines that any of such claims have a value greater than $0, it is the Debtors' position that such claims are unliquidated, and cannot be easily ascertained as to their value.

The Debtors described the California judgment as follows:

> Xytest, Berbeco, Kufis, Kurtz and Roberts purport to hold a valid judgment against the Debtors and Somerset in the amount of:
>
> * $25,000 in compensatory damages
>
> * $250,000 in punitive damages
>
> * Costs of $12,608.26
>
> Such purported claim is called herein the "Purported Xytest Claim."
>
> Such claim was discharged in the Prior Bankruptcy Case. In March, 2000, the Debtors filed a motion to add the Purported Xytest Claim as a debt to be discharged in the Prior Bankruptcy Case. Only one such purported creditors, Xytest, filed an opposition to such motion. Such motion was allowed on May 30, 2000.

This assertion is incorrect. On May 30, 2000, this Court entered an order in the Debtors' Chapter 7 case, specifically providing that the allowance of the Debtors' Motion to Amend Schedules did not constitute "a determination that the creditors known as the Xytest Group, as identified in the Motion, have allowable or dischargeable claims against the Debtors." Moreover, in the adversary proceeding pending in the Debtors' Chapter 7 case, Xytest and Berbeco are seeking a determination that

California judgement is not subject to discharge.

Following the filing of the Debtors' petition, Schedules, Statement of Financial Affairs and Statement Concerning Schedules, the Court, on August 15, 2000, issued an order directing the Debtors to file a Chapter 13 Plan by August 30, 2000. Moreover, on August 28, 2000, the Court issued an order directing the Debtors to show cause in writing, within 10 days of the date of the order, why their Chapter 13 case should not be dismissed pursuant to 11 U.S.C. § 109(e).

On August 29, 2000, the Debtors moved for an extension of time until September 13, 2000 to file their Chapter 13 Plan. The Debtors did not request an expedited determination of their motion, and the Court granted the Debtors' request on September 14, 2000.[10]

On September 5, 2000, the Debtors also moved for an extension of time to respond to the Order to Show Cause until September 18, 2000. On the same day, the Court granted the Debtors' request for an extension.

On September 18, 2000, the Debtors filed a three inch thick, 130 page Verified Memorandum of Law Concerning their Eligibility to be Chapter 13 Debtors. In addition, they filed the Affidavit of Marilyn W. Mitchell in Support of Debtors' Memorandum of Law Concerning Their Eligibility to be Chapter 13 Debtors. In her affidavit, Marilyn Mitchell stated the following:

> On or about July 30, 2000, I signed a contract with James and Mary Mitchell. In such contract, I agreed to pay them for finding acquisitions and *to continue litigating* the Somerset–Xytest Dispute. I will also provide monies to pay for *certain* payments to fund a chapter 13 plan for the Debtors, including payments to creditors and administrative and priority expenses. In return, I will

---

10. Because the Debtors did not obtain an extension of time to file their Chapter 13 plan until September 14, 2000, after the Debtors plan was due, the Debtors technically did not have permission to file their plan after August 30, 2000 deadline.

receive (among other things) certain economic benefits from closed acquisitions and 20 percent of the Net Proceeds from any settlement or judgment in the Somerset–Xytest Dispute. . . .

Under the terms of such contract, absent certain events, I am obligated to pay the Debtors monies for 4 years after the Confirmation Date of the Chapter 13 plan in this case. . . . [11]

On or about September 2, 2000, I signed a similar contract with Somerset. . . .

I have . . . agreed to finance expenses relating to closing acquisitions, including travel, attorneys [sic] fees, and lender deposits. . . .

I am concerned about being sued by the Xytest Group. I do not want to spend large sums of money defending myself in a meritless lawsuit. I believe they would engage in the same kind of "scorched earth" tactics that they have used against the Somerset Group. . . .

Although the Debtors are not lawyers, based on what I have seen, they are talented *pro se* litigators who are knowledgeable about Massachusetts law.

In the contract with the Debtors, I gave the Debtors full authority to litigate the Somerset–Xytest Dispute as they saw fit. I insisted, however, on a provision that I would have to approve any settlement of such dispute. I did so primarily because I want to make certain that in any such settlement, the Xytest Group would execute a full general release of me.

*I believe it it [sic] economically rationale of me to pay the Debtors to spend a portion of their time litigating the Somerset–Xytest Dispute* for two reasons. First, I believe the merits of such dispute are very strong from the point of view of the Somerset Group. Although so far the lawsuits have not gone well, I believe in the long run the Xytest Group will not prevail in their argument that

they should not be held liable for the various contracts they signed. I believe the claims against the Xytest Group are very valuable.

Second, I want the Debtors to continue litigating such dispute so that they can effectuate a settlement with the Xytest Group, with such settlement including a full general release of me.

*Assuming the Somerset Group is able to litigate the Somerset–Xytest dispute solely in Massachusetts (either in this Court or the Suffolk Superior Court), I am willing to finance a Chapter 11[sic] reorganization of the Debtors.*

In the Somerset Bankruptcy Case before Judge Queenan, I was willing to finance a Chapter 11 reorganization for Somerset if Judge Queenan reimposed the automatic stay in that case. . . .

Assuming that the Somerset Group is able to litigate the Somerset–Xytest Dispute solely in Massachusetts (either in this Court or the Suffolk Superior court), I am willing to finance a Chapter 11 reorganization of Somerset in this Court (Feeney J.).

(Emphasis supplied).

The Debtors did not file a Chapter 13 Plan on September 13, 2000 or by September, 18, 2000. On September 19, 2000, the Court dismissed the Debtors' Chapter 13 case with prejudice pursuant to 11 U.S.C. 109(g) for failure to timely file a Chapter 13 Plan in accordance with the order of August 15, 2000.

On September 22, 2000, the Debtors filed their Verified Motion to Vacate Dismissal, in which they stated that they mistakenly assumed "that this Court wanted to rule on the Debtors' eligibility to be Chapter 13 debtors before the Debtors filed their Chapter 13 Plan," that they have not been dilatory and that they are guilty of human error only, that their conduct has cause no harm, and that there is authority to vacate the dismissal. Additionally, the Debtors filed a Chapter 13

---

**11.** The Debtors' Chapter 13 plan is discussed below. It is a three year plan.

Plan in which they stated as a preface the following:

> The Plan uses certain defined terms specified in the Statement Concerning Schedules that is attached to the Debtors' petition and schedules and which was filed with this Court on August 15, 2000, as amended from time to time by the Debtors. All factual allegations contained herein are qualified to the extent specified in the Statement Concerning Schedules.

The Debtors stated in their Chapter 13 Plan that they have entered into a contract with Marilyn Mitchell "for necessary living expenses" and that the term of the contract is four years "from the Confirmation Date of this Plan," although the term of the plan is 36 months. Pursuant to their contract with Marilyn Mitchell, the Debtors indicated that, in addition to paying for "necessary living expenses," Marilyn Mitchell would provide them with funds to 1) pay 100 percent of allowed secured claims, although the only secured claim is that of Mary Mitchell's mother, Loretta Troy, which the Debtors intend to pay directly at the rate of $100 per month outside the Plan, priority claims (none) and administrative claims (the Chapter 13 Trustee's fees only); 2) pay a 10 percent dividend to all allowed unsecured claims (exclusive of claims for punitive damages); and 3) pay a one percent dividend with respect to unsecured claims for punitive damages. In exchange, the Debtors stated, among other things, 1) that they will commit to look for companies to acquire and that Marilyn Mitchell will have the right of first refusal to invest in acquisitions; 2) that they will "agree to continue litigating the Somerset–Xytest Dispute, and will not settle such dispute without the prior written consent of Marilyn Mitchell," who will receive 20 percent of the net proceeds from any settlement of the Somerset–Xytest Dispute, as well as a full general release; and 3) that they will transfer title to all intangible property which they own (exclusive of claims) to Marilyn Mitchell.

The Debtors also indicated in their plan that the general unsecured creditors total $56,764. Thus, the claim of David Bromley in the approximate sum of $47,000 constitutes over 80% of the unsecured claims according to the Debtors' figures. With respect to the punitive damages claims, the Debtors stated that "[i]n the unlikely event that this court concludes that not all of such punitive damages claim was discharged in the Prior Bankruptcy Case, such punitive damage claims are to [be] separately classified as "D" claims, and shall receive a one percent (1%) dividend." [12] Nevertheless, the Debtors state that the "[t]otal amount of separately classified claims payable at 1% [is] $0."

The Debtors also proposed to pay 100% of all allowed claims if they are permitted to litigate the Somerset–Xytest Dispute exclusively in either state or federal court in Massachusetts and the proceeds from the litigation are received no later than August 15, 2010. Additionally, the Debtors stated the following:

> [A]s noted in the Mitchells' Agreement with Marilyn Mitchell, the Debtors and Marilyn Mitchell propose that initial payments be $25 month [sic] (plus Chapter 13 Trustee commission), until this Plan is confirmed. The reason for this is that Marilyn Mitchell does not want to provide monies if this Plan is not confirmed. After this Plan is confirmed, Marilyn Mitchell will provide monies to increase the $170 monthly payment to make up for the reduced payments before this Plan is confirmed. If this Court rejects this proposal, Marilyn Mitchell will provide monies to pay $170 per month, beginning 30 days after this Court rejects such a proposal.

---

12. The Debtors indicated in another section of their plan that "if this Court does not permit a separate classification for such punitive damage claims, then such claims will be paid a ten percent (10%) dividend."

Notably, the Debtors did not include a copy of their contract with Marilyn Mitchell with their Statement Concerning Schedules. Nor did they attach it to their Chapter 13 Plan or to any of the other pleadings that they filed.

With respect to the claim of David Bromley, the Court notes that it is not evident from the Debtors' pleadings that David Bromley actually holds a claim against the Debtors. The Debtors attached to their Verified Sur–Surreply Memorandum in Support of Debtors' Verified Motion to Vacate Dismissal, the Affidavit of David L. Bromley in Support of Motion to Reconsider this Court's Allowance of Xytest's Emergency Motion for Relief from the Automatic Stay filed in the Somerset bankruptcy case (Case No. 99–40955–JFQ). In the affidavit filed in the Somerset case, Bromley stated under oath the following:

> In 1996, James H. Mitchell, III ("Mr. Mitchell") told me that he and Somerset Capital Corporation ("Somerset") was [sic] working on a merger of several companies in the back-end of the semiconductor manufacturing equipment industry (the "Semitest Transaction").
>
> I asked Mr. Mitchell if I could invest in the Semitest Transaction, and James Mitchell agreed.
>
> Mr. Mitchell, on behalf of Somerset, and I agreed that I would advance $25,000. I advanced $25,000 in April 1996. If the Semitest Transaction happened, this $25,000 would be invested as common equity in the merger. If the Semitest Transaction did not happen, *this $25,000 would be a loan to Somerset*, payable on demand with interest accruing at the rate of one percent (1%) per month.
>
> ***
>
> My relationship to Somerset is as a creditor.

(Emphasis supplied). Thus, this affidavit clearly indicates that Bromley loaned money to Somerset, not the Debtors. In addi-tion, the Debtors, in listing his claim, stated that he made a check payable to FET Acquisition Company, Inc., not them.

## III. DISCUSSION

The Court finds that granting the Debtors' Motion to Vacate Dismissal would be futile because the Debtors are not eligible for Chapter 13 relief. Additionally, the Court finds that a penumbra of bad faith emerges from the Debtors' Schedules, Statement of Financial Affairs, Statement Concerning Schedules, and Chapter 13 plan, which so affects their Chapter 13 case as to warrant a bar to a further bankruptcy filing for a period of 360 days.

### A. *Eligibility under 11 U.S.C. § 109(e)*

█ Section 109(e) of the Bankruptcy Code provides the following:

> (e) Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $269,250 and noncontingent, liquidated, secured debts of less than $807,750, or an individual with regular income and such individual's spouse, except a stockbroker or a commodity broker, that owe, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts that aggregate less than $269,250 and noncontingent, liquidated, secured debts of less than $807,750 may be a debtor under chapter 13 of this title.

11 U.S.C. § 109(e). The term "debt" is defined in the Bankruptcy Code as "liability on a claim." 11 U.S.C. § 101(12). The word "claim," in turn, is defined to include "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured...." 11 U.S.C. § 101(5)(A). Congress intended that the terms "debt" and "claim" be coextensive: " 'a creditor has a 'claim' against the debtor; the debtor owes a 'debt' to the creditor.' " *In re Dow Corning Corp.*, 215

B.R. 346, 357 (Bankr.E.D.Mich.1997) (citing S.Rep. No. 989, 95th Cong., 2d Sess. 23, reprinted in 1978 U.S.C.C.A.N. 5787, 5809; H.Rep. No. 595, 95th Cong., 2d Sess. 310, reprinted in 1978 U.S.C.C.A.N. 5963, 6267).

In their memoranda, the Debtors argued strenuously that the California judgment, the so-called Purported Xytest Claim, is contingent and unliquidated. Additionally, they asserted in their Statement Concerning Schedules that it was discharged in their prior Chapter 7 case. The Court must address this assertion first. Contrary to the Debtors' assertion, this Court has not determined that the California Judgment against them was discharged in their Chapter 7 case. Indeed, in its order of May 30, 2000 granting the Debtors' Verified Motion to Amend Schedules filed in their Chapter 7 case, the Court stated, "[t]he allowance of this Motion does not constitute a determination that the creditors known as the Xytest Group, as identified in the Motion, have allowable or dischargeable claims against the Debtors." Additionally, an adversary proceeding to determine whether the judgment was the result of postpetition conduct on the part of the Debtors is now pending before this Court in the Debtors' Chapter 7 case. Accordingly, this statement made by the Debtors in their Statement Concerning Schedules has no basis whatsoever in fact, is false and is evidence of bad faith.

■■■ In the instant case, Xytest and Berbeco and the other plaintiffs in the California action obtained a judgment against the Debtors and Somerset on June 15, 1999 that is presently pending on appeal. Although under California law that judgment is not entitled to res judicata effect,[13] it is not a nullity and cannot be ignored. In *Sullivan v. Delta Air Lines, Inc.*, 15 Cal.4th 288, 63 Cal.Rptr.2d 74, 935 P.2d 781 (1997), the court discussed the

meaning of the "phrase 'final judgment,' i.e., a judgment is not 'final' as long as it remains subject to direct attack by appeal, by motion for a new trial, or motion to vacate the judgment," adding "[t]he phrase has been given that meaning in a variety of appropriate contexts." *Id.*, 63 Cal.Rptr.2d 74 at 83. However, it also observed the following:

> [F]inality on appeal is not the only meaning of the phrase "final judgment." On the contrary, it has long been recognized that "No hard-and-fast definition of 'final' judgment applicable to all situations can be given, since its finality depends somewhat upon the purpose for which and the standpoint from which it is being considered, and it may be final for one purpose and not for another. (Freeman on Judgments, 5th ed., sec. 27.) This is so manifest that it would be idle to attempt any exhaustive examination into the different cases in which the word 'final' is employed." *(Howard v. Howard* (1927) 87 Cal.App. 20, 25, 261 P. 714, italics added [sic].) One of those other meanings, however, is relevant here.

> In its most fundamental sense, "finality" is an attribute of every judgment at the moment it is rendered; indeed, if a judicial determination is not immediately "final" in this sense it is not a judgment, no matter what it is denominated. The Legislature has incorporated this meaning of finality into the very definition of a judgment: "A judgment is the final determination of the rights of the parties in an action or proceeding." (Code Civ.Proc., § 577, italics added.) And we have explained the meaning as follows: "A judgment is final 'when it terminates the litigation between the parties on the merits of the case and leaves nothing to be done but to enforce by execution

---

13. Under California law, "state court judgments are not final until the period during which an aggrieved party may file an appeal has expired, or, in cases of appeal, the judgment has been affirmed and the case remit-

ted." *Morrow v. Torrance Bank (In re Morrow)*, 189 B.R. 793, 807 (Bankr.C.D.Cal.1995) (citing *People v. Mitchell Bros.' Santa Ana Theater*, 101 Cal.App.3d 296, 161 Cal.Rptr. 562 (1980)) (footnotes omitted).

what has been determined.'" (*Doudell v. Shoo* (1911) 159 Cal. 448, 453, 114 P. 579; *accord, Lyon v. Goss* (1942) 19 Cal.2d 659, 670, 123 P.2d 11; *Olson v. Cory* (1983) 35 Cal.3d 390, 399, 197 Cal. Rptr. 843, 673 P.2d 720.) *Finality in this sense not only makes a judicial determination a judgment, it also makes that judgment appealable.* As we recently observed, "A judgment that leaves no issue to be determined except the fact of compliance with its terms is appealable." (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 9, 270 Cal.Rptr. 796, 793 P.2d 2.) Indeed, recognizing that this meaning of finality is so fundamental that it is essentially redundant to speak of a "final judgment" in this sense, the Legislature no longer provides in the basic statute authorizing appeals from the superior court that such an appeal may be taken "From a final judgment entered in an action, or special proceeding" (former Code Civ.Proc., § 963, subd. 1, italics added); the statute now provides simply that an appeal may be taken "From a judgment" (Code Civ.Proc., § 904.1, subd. (a)(1)). The meaning is the same.

It follows that while it is pending on appeal a judgment is both "final" in the sense that it is appealable and not "final" in the sense that the appeal remains unresolved. (*See, e.g., Pacific Gas & Elec. Co. v. Nakano, supra,* 12 Cal.2d 711, 714, 87 P.2d 700; *Gilmore v. American C.I. Co.* (1884) 65 Cal. 63, 66, 2 P. 882; *Oak Grove School Dist. v. City Title Ins. Co.* (1963) 217 Cal.App.2d 678, 696, 32 Cal.Rptr. 288.)

*Sullivan,* 63 Cal.Rptr.2d at 84, 935 P.2d 781 (emphasis supplied). In short, although California does not give res judicata effect to judgments that are on appeal, it recognizes that without some degree of finality a judgment would not be appealable. Accordingly, the California judgment, regardless of how the Debtors may view it, is entitled to recognition as a final judgment for purposes of § 109(e) and must be listed as a debt or liability on claim in a bankruptcy case.

The decision of the United States Bankruptcy Court for the Southern District of California in *In re Keenan,* 201 B.R. 263 (Bankr.S.D.Cal.1996), bears directly on the issue of whether the pendency of an appeal renders a judgment contingent or unliquidated for bankruptcy purposes. In that case, a creditor obtained a judgment against the debtor in excess of $18 million including punitive damages. The debtor filed a notice of appeal and, one month later, filed a Chapter 11 petition. In his Chapter 11 case, the debtor argued "that because California denies issue preclusive effect to a judgment pending appeal, the claim of the creditor is necessarily contingent and unliquidated." 201 B.R. at 264. The debtor also attacked the judgment pointing to multiple errors in the judgment.

The court observed that the Bankruptcy Code does not define the terms contingent and unliquidated. It stated, however, that because the creditors claim had proceeded to judgment in state court "[the creditor's] claim is neither contingent nor unliquidated for purposes of 11 U.S.C. § 502(c). That is so despite the fact that the debtor has appealed the judgment, and despite the peculiarity of California law that keeps a judgment non-final for issue preclusion purposes so long as an appeal is pending." 201 B.R. at 266.

■ The *Keenan* court noted that case law uniformly holds that a claim is not contingent "if all events giving rise to liability occurred prior to the filing of the bankruptcy petition." *Id.* at 264 (citing *U.S. v. Verdunn,* 89 F.3d 799, 801 n. 7 (11th Cir.1996); *In re Fostvedt,* 823 F.2d 305, 306 (9th Cir.1987); *In re Loya,* 123 B.R. 338, 340 (9th Cir. BAP 1991); *In re Dill,* 30 B.R. 546, 549 (9th Cir. BAP 1983), *aff'd,* 731 F.2d 629 (9th Cir.1984)). *See also Mazzeo v. U.S. (In re Mazzeo),* 131 F.3d 295, 303 (2nd Cir.1997); *In re Knight,* 55 F.3d 231, 236 (7th Cir.1995). In the instant case, the Court finds that all events

giving rise to the Debtors' liability to the Xytest Group occurred prior to the filing of the Chapter 13 petition. Thus, the California judgment is not a contingent debt.

■ "[W]hether a debt is liquidated turns on whether it is subject to 'ready determination and precision in computation of the amount due.'" *Keenan*, 201 B.R. at 265 (citing *Fostvedt*, 823 F.2d at 307). In *Mazzeo*, the United States Court of Appeals for the Second Circuit observed the following:

> A few courts have held that the existence of a dispute, without more, is sufficient to render a claim unliquidated. *See, e.g., In re Lambert*, 43 B.R. 913, 921 (Bankr.D.Utah 1984) (stating that a dispute as to liability renders the entire debt unliquidated, and that a dispute as to a particular amount renders the disputed amount unliquidated); *In re King*, 9 B.R. 376, 378 (Bankr.D.Or.1981) (stating that "a debt is not liquidated if there is a substantial dispute regarding liability or amount"). The "overwhelming body of precedent," however, is to the contrary. *United States v. Verdunn*, 89 F.3d at 802 n. 9 ("Most courts have concluded ... that disputed debts are included in the calculation of the amount of debt for [Chapter 13] eligibility purposes.... [T]he vast majority of courts have held that the existence of a dispute over either the underlying liability or the amount of a debt does not automatically render the debt either contingent or unliquidated." (internal quotation marks omitted)). We agree with the majority position. The Code uses both "unliquidated" and "disputed" in its definition of "claim"; to rule that a claim (and hence the debt with which it is coextensive) is unliquidated whenever it is disputed would be to render the term "unliquidated" mere surplusage. Such an interpretation would also allow a debtor, simply by characterizing certain claims as disputed, to ensure his eligibility to proceed under Chapter 13 in circumstances that Congress plainly intended to exclude from that chapter. We conclude that effect must be given to both terms, and we agree with the Eleventh Circuit that "the concept of a liquidated debt relates to the amount of liability, not the existence of liability." *United States v. Verdunn*, 89 F.3d at 802.

131 F.3d at 304–05. In short, a majority of courts rejects the reasoning of decisions like *Lambert*, upon which the Debtors rely, and holds that a state court judgment against a debtor that is on appeal as of the date of the filing is not contingent even though it may be disputed. *See, e.g., In re Albano*, 55 B.R. 363 (N.D.Ill.1985); *In re Johnson*, 191 B.R. 184 (Bankr.D.Ariz. 1996); *In re Weller*, 189 B.R. 467 (Bankr. E.D.Wis.1995).

■ As of the date of the Debtors' Chapter 13 filing, Xytest and Berbeco and the other plaintiffs in the California action had obtained a judgment and thus the amount of their claims are readily calculable. Therefore, the claims are liquidated, regardless of whether the Debtors dispute the liability. This Court specifically rejects the reasoning of the court in *Lambert* as it represents a discredited minority view that would merely serve to encourage manipulation of the Bankruptcy laws by debtors.

To repeat, in *Keenan*, the court stated that because the creditor obtained a judgment in state court that preceded the filing of the debtor's bankruptcy petition, the claim was neither contingent nor unliquidated for purposes of § 502(c). 201 B.R. at 266. This Court can find no reason for holding that the rationale in *Keenan* is inapplicable to the determination of whether the Debtors are eligible for Chapter 13 simply because § 109(e) refers to "noncontingent" and "unliquidated," debts and § 502(c) refers to "contingent" and "unliquidated" claims. *See In re Dow Corning Corp.*, 215 B.R. 346, 355–58 (Bankr. E.D.Mich.1997). *Cf. Matter of Merchants Grain, Inc.*, 93 F.3d 1347 (7th Cir.1996) (restating the oft repeated maxim of statu-

tory construction that "identical words used in different parts of the same act are intended to have the same meaning.") (quoting *Atlantic Cleaners & Dyers v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932)).

■ The court in *Keenan* also determined that the Rooker–Feldman Doctrine was applicable to the dispute. The court reasoned as follows:

> The essence of both the statute and the decisions [*Rooker v. Fidelity Trust,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983) ] is that lower federal courts do not have jurisdiction to sit in appellate review of decisions of state courts, except in habeas corpus proceedings.

> In the pending motion to estimate [the creditor's] claim, debtor's whole bases for the estimation of both liability and amount of the claim are attacks on alleged errors in the judgment. Yet debtor says in his Supplemental Brief that he "is not attempting to modify, amend, annul or attack the underlying state court judgment." However, his whole argument for why the [the creditor's] claim should be estimated at zero or some other amount less than the amount set by the jury focuses on claims of error in the state court judgment.

> At the same time as he attacks the state court judgment to argue why various components of the damage award are not valid components of [the creditor's] claim, debtor asserts he is not attacking the state court judgment, and that its validity will be determined on appeal in the state courts. Yet he wants the state court judgment to be ignored, and for this Court to estimate under state law what a state court or jury would find the claim was worth, so that the debtor can confirm a plan to provide for allowed claims, and to receive a discharge as to all other claims, or portions of claims not paid through the plan.

> [The creditor] is the major creditor in this case, and if her claim is allowed in an amount even approximating the amount of the judgment, debtor has insufficient assets to pay it. In this Court's view, debtor's argument is disingenuous. Debtor really is seeking to have a second try at his defense to the state case. He wants this Court to substitute its judgment for the judgment already reached by a state court jury and judge. The Rooker–Feldman doctrine precludes such a result.

> Nor is it availing to debtor that under California law the state judgment is not final because it is on appeal. In *Worldwide Church of God v. McNair,* 805 F.2d 888, 893 at n. 3 (9th Cir.1986), the court wrote:

>> We agree with the Second and Fifth Circuits that the Feldman doctrine should apply to state judgments even though state court appeals are not final.

> *See also, Goetzman v. Agribank, FCB,* 91 F.3d 1173 (8th Cir.1996); *Hale v. Harney,* 786 F.2d 688, 691 (5th Cir. 1986); *In re Morrow,* 189 B.R. 793, 810 (Bankr.C.D.Cal.1995).

> As Rooker–Feldman makes clear, using the claims estimation process as a mechanism for de novo or appellate review of state court judgments does violence to the roles and relationships of the federal and state judiciaries, and could create unwarranted friction. Such a mechanism, if it existed, also might lead to forum shopping in an inappropriate way.

201 B.R. at 266–67. *See also In re Audre, Inc.,* 216 B.R. 19, 20 (9th Cir. BAP 1997).

The Debtors' position in the instant case is similar to the debtor's position in *Keenan,* though less subtle. The Debtors' manipulate their Schedules to obfuscate the outstanding judgment against them and to obtain Chapter 13 protection. Relying upon *Comprehensive Accounting Corp. v Pearson (In re Pearson),* 773 F.2d 751 (6th

Cir.1985), they maintain that this Court should rely primarily upon their schedules to determine their eligibility for Chapter 13 relief. The decision of the court in *In re Redburn*, 193 B.R. 249 (Bankr. W.D.Mich.1996), undermines that reasoning.

In *Redburn*, the issue was "whether a judgment debt which is subject to a nondischargeability action in a pending chapter 7 case should be deemed 'noncontingent' and/or 'liquidated' within the meaning of § 109(e) to determine chapter 13 eligibility." 193 B.R. at 252. In listing the judgment creditors on Schedule F, the debtor checked the box marked "contingent" and the box marked "disputed" but did not check the box labeled "unliquidated." Instead, he indicated that the amount of each claim was "unknown," although he apparently viewed the claims as unliquidated. *Id.* at 254.

The Michigan court began its discussion of *Pearson*, noting that "eligibility should normally be determined by the debtor's schedules checking only to see if the schedules were made in good faith." *Id.* at 255. The court, however, added a caveat: "the court is not necessarily bound by the information contained in a debtor's schedules where 'it appears to a legal certainty that the amount owed is other than what the debtor says is owed....'" *Id.* (citations omitted). *See also In re Mannor*, 175 B.R. 639 (Bankr.E.D.Mich.1994) (because the amount of the judgment against the debtor was "legally certain," court determined that the debtor was not eligible to be a Chapter 13 debtor).

In *Redburn*, the court stated the following:

Similar to *In re Mannor*, it appears to "a legal certainty" that the total amount claimed by the creditors exceeds the limits on unsecured debt as set forth in § 109(e). The Debtor cannot circumvent this limitation on eligibility by simply ignoring what he knows and listing the amounts of the debts as "unknown" in his schedules. To decide otherwise would eviscerate the chapter 13 eligibility requirements. *See generally In the Matter of McGovern*, 122 B.R. 712, 714 (Bankr.N.D.Ind.1989) ("Congress did not intend that debtors would be given exclusive control over the accessibility to Chapter 13 or be permitted to circumvent its debt ceilings by the artful manipulation of the information contained in bankruptcy filings.").

In *Redburn*, the court also discussed the consequences of a pending dischargeability action. It stated the following:

Until such time as the "right to payment", i.e., the "claim", under § 101(5) is defeated, the "liability on [the] claim", i.e., the "debt" under § 101(12) remains. The proper conclusion is that a debt (in this case, a noncontingent liquidated debt) is not discharged until after the trial in the chapter 7 proceeding when the bankruptcy court holds the debt to be dischargeable. It is at this time when any state court judgment is voided, pursuant to § 524(a)(1), and the discharge injunction becomes effective, under § 524(a)(2). It is also at this time that there is no longer a "liability on the claim" and the "debt" is therefore not counted for chapter 13 eligibility. However, so long as the debt remains nondischargeable, the creditor continues to hold a "right to payment" and the debtor remains "[liable] on a claim." Accordingly, the judgment held by the Objecting Creditors, even though in limbo in the chapter 7 nondischargeability litigation, constitutes a "debt" within the meaning of § 109(e), and counts toward the eligibility limits for chapter 13.

In summary, the Objecting Creditors' claims, now subject to the chapter 7 nondischargeability actions, are not now discharged. The Debtor's mishmash of semantic contentions regarding the terms "disputed", "contingent", and "unliquidated" does not suffice to satisfy or circumvent the chapter 13 eligibility re-

quirements. An otherwise liquidated and noncontingent debt does not become "contingent" simply because of the pendency of a chapter 7 nondischargeability action. To rule otherwise would invite abuse of the chapter 13 bankruptcy process.

193 B.R. at 261. *See also In re Cluett,* 90 B.R. 505 (Bankr.M.D.Fla.1988).

In sum, the Court finds that the Debtors are ineligible for Chapter 13 relief as the amount of their unsecured indebtedness exceeds the limits imposed by § 109(e). Accordingly, granting the Debtors' Verified Motion to Vacate Dismissal would be futile.

### B. *Lack of Good Faith*

■ Assuming arguendo that this Court were to find that the California judgment did not render the Debtors ineligible for Chapter 13 relief, there are other reasons why granting the Debtors' Verified Motion to Vacate Dismissal would be futile, why dismissal with prejudice is warranted, and why this Court should modify its order of September 19, 2000 to bar the Debtors from filing another bankruptcy case for a period of 365 days. Not only have the Debtors failed to use the Official Forms, they, in effect, have failed to sign their Schedules and Statement of Financial Affairs under penalty of perjury because they subjected their contents to the "qualifications" specified in their Statement Concerning Schedules. The Debtors expressly stated in this document that it was intended to modify and supercede the information in their Schedules, but they did not sign, let alone sign under penalty of perjury, the Statement Concerning Schedules.

Fed.R.Bankr.P. 9009 provides that "[t]he Official Forms ... shall be observed and used with alterations as may be appropriate." Nevertheless, the Introduction and General Instructions that accompany the Official Rules provide that "alteration

will be appropriate only in rare circumstances." *See also* Fed.R.Bankr.P. 1007(b) which requires "the debtor, unless the court orders otherwise, ... to file schedules of assets and liabilities, a schedule of current income and expenditures, a schedule of executory contracts and unexpired leases, and a statement of financial affairs, *prepared as prescribed by the appropriate Official Forms.*" (Emphasis supplied). The Debtors' financial circumstances are not so complex as to warrant alteration to the Official Forms. The Court infers from the Debtors' failure to utilize the Official Forms, particularly Schedules I and J, that they intended to confuse rather than enlighten parties in interest about their economic circumstances. This is evidence of bad faith on their part.[14]

■ In addition, the Court finds that the Debtors have not, and are unable to substantiate their income. Income is broadly defined to include all sources of income. The Debtors do not have their own bank accounts and admittedly cannot state with accuracy the total amount of the income they receive from Marilyn Mitchell. Additionally, they are unsure about whether monies given to them by Loretta Troy constitute gifts or loans.

The Debtors' parents, particularly Marilyn Mitchell, pay *all* their expenses. The Debtors have provided some information about these expenses. The Debtors admit, however, that other expenses, especially litigation expenses, are paid directly by Marilyn Mitchell, and the Debtors do not have records to substantiate these expenses.

The total of the Debtors' expenses equals their income based upon the representations made in their Statement Concerning Schedules. Because the Debtors lack access to bank account statements and records, as well as Marilyn Mitchell's financial records, they have not substanti-

---

14. The Debtors also stated that they are involved in businesses that incur trade debt, but they failed to submit all the documents required by the Massachusetts Local Bankruptcy Rules, Appendix 1, 13–2(a)(7).

ated all their expenses. Accordingly, the Debtors cannot substantiate all their income. Additionally, the Debtors' expense itemization includes substantial sums for credit card payments, which are unexplained. The failure to explain credit card payments which averaged $1,400 per month for calendar year 1999 and $766 per month for the first seven months of this year undermines whatever integrity their other Schedules have. The Debtors do not indicate whether the credit cards are in their names, what types of expenses the credit cards were used to pay, and why, if the credit cards are in their names, the credit card companies were not listed on Schedule F. Accordingly, the Court finds that the Debtors have not provided credible information about either their income or their expenses.

In view of the problems associated with the Debtors' income and expenses noted above, the Debtors would be unable to satisfy the best efforts tests set forth in 11 U.S.C. § 1325(b), which provides in relevant part the following:

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—...

> (B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

(2) For purposes of this subsection "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—

> (A) for the maintenance or support of the debtor or a dependent of the debtor ... and
>
> (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continua-

tion, preservation and operation of such business.

11 U.S.C. § 1325(b). In view of the positions taken by Xytest in this case and the Debtors' pending Chapter 7 case, the Court finds that if it were to grant the Motion to Vacate it would be more likely than not that Xytest would object to confirmation of the Debtors' Chapter 13 plan, particularly in view of the Debtors' proposed treatment of the punitive damages portion of the California judgment.

The actual amount of the Debtors' income is so speculative that application of the best efforts test would be impossible. Moreover, the Debtors' have failed to indicate that their income is regular in the sense that Marilyn Mitchell deposits a regular sum of money on a regular basis into the bank account from which the Debtors can draw funds. Under these circumstances, the Court cannot conclude that the Debtors have "regular income" for purposes of Chapter 13. For example, the Debtors stated that Marilyn Mitchell pays them "$70,800 per year, *plus additional amounts for litigation expenses.*"(Emphasis supplied). The Debtors also indicated on their "Schedule J" that their expenses totaled $102,706.13 for 1999. Based upon their numbers for the first seven months of this calendar year, their expenses will total approximately $85,000.00 for this year. Thus, if the Debtors' statement is true that litigation expenses are expenses in excess of $70,800, then Marilyn Mitchell would appear to be subsidizing the Debtors litigation expenses *at least* in the range of $14,000 to $32,000 per year. Yet, the Debtors stated that litigation expenses are "underrepresented." Moreover, to confound the issue even more as to how much the Debtors' spend litigating is their report on their "Schedule J" that their litigation expenses were $49 for the seven month period beginning on January 1, 2000 or an average of $7 per month. The Debtors' Chapter 13 plan is predicated upon a finding that their litigation expenses in whatever amount they (or Mari-

lyn Mitchell) elect to spend are "reasonably necessary to be expended … for the maintenance or support of the debtor[s]." The Court could not make such a finding for purposes of § 1325(b), and the Debtors have failed to cite any authority to support the proposition that payment of litigation expenses would be reasonably necessary for their support.

The funding of the Debtors' Chapter 13 plan is based *exclusively* upon payments to be made by Marilyn Mitchell in the *post confirmation* sum of $170 per month, a sum sufficient to pay a 10% dividend to allowed unsecured claims and a 1% dividend with respect to claims for punitive damages. Two problems with this approach are patent: 1) the Debtors appear to be filing a percentage plan, although this Court has expressed the view that Chapter 13 requires so-called "pot plans," *see In re Barbosa*, 236 B.R. 540 (Bankr. D.Mass.1999); *In re Witkowski*, 16 F.3d 739 (7th Cir.1994); and 2) until such time as this Court determines the dischargeability of the California judgment held by Xytest and Berbeco and others, the Debtors cannot bifurcate the compensatory and punitive damage portions of the California judgment without discriminating unfairly among unsecured creditors. *See* 11 U.S.C. § 1322(b)(1). *Cf. Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998).

■ Several more factors compel this Court to find that the Debtors' Chapter 13 case and Chapter 13 plan have been filed in bad faith. In the first place, Marilyn Mitchell appears to have no intention of funding the Debtors' Chapter 13 plan unless the Debtors continue litigating the Somerset–Xytest dispute. The Court has serious concern that such a provision violates, or is even void against, public policy, as such a contractual provision serves to thwart the goal of Chapter 13 which is repaying debt, not fomenting litigation. While the Debtors certainly have a right to pursue their appeal from the California judgment, conditioning payments to credi-

tors on continuing litigation is another matter, particularly when the creditors hold noncontingent, liquidated claims in the Chapter 13 case.

■ Finally, on November 8, 2000, while this decision was in draft, the Debtors filed another Chapter 13 petition (Case No. 00–17437–JNF). The Debtors filed this new petition at a time when this Chapter 13 case stood dismissed under 11 U.S.C. § 109(g). Thus, despite the 180-day prohibition against refiling set forth in this Court's order of September 19, 2000, and without obtaining a decision from this Court on their Motion to Vacate or without filing a notice of appeal from this Court's order of September 19, 2000, the Debtors filed a Chapter 13 petition that appears to be identical in all substantive respects to the petition that they filed on August 15, 2000. The Court finds that this conduct demonstrates the Debtors' profound disrespect for and disregard of the Bankruptcy Code and Bankruptcy Rules, reveals their intention to manipulate bankruptcy law for purposes other than repayment of debt, and supports the decision of this Court to deny the Debtors' Verified Motion to Vacate. Indeed, such conduct now warrants modification of the Court's order of September 19, 2000 to prohibit the Debtors from refiling under any Chapter of the Bankruptcy Code for a period longer than 180 days.

## IV. CONCLUSION

In view of the foregoing, the Court shall enter an order denying the Debtors' Verified Motion to Vacate Dismissal as granting the Motion to Vacate would be futile. The Debtors' noncontingent, liquidated unsecured debt exceeds the debts ceiling set forth in 11 U.S.C. § 109(e). Moreover, the Court finds that the Debtors' Chapter 13 petition, Schedules and Statement of Financial Affairs, as well as the Debtors conduct in ignoring this Court's order of September 19, 2000, warrant modification of the Court's order of September 19, 2000 to provide for a bar to further bankruptcy

filings for a period longer than that set forth in 11 U.S.C. § 109(g). Accordingly, the Court shall enter an order barring the Debtors from filing a Chapter 13 or a Chapter 11 petition for a period of one year from the date of the order.